**The OHIO CASUALTY INSURANCE COMPANY, a Corporation, Plaintiff,**

**v.**

**Michael LUTKIE, H. Marjorie Hart, Phillip Hart and John R. Hart, Defendants.**

**Civ. A. No. W–3772.**

United States District Court
D. Kansas.

June 24, 1968.

Kahrs, Nelson, Fanning & Hite, Wichita, Kan., for plaintiff.

Render & Kamas, Wichita, Kan., for defendants Hart.

Eisenbise & Wallace, Wichita, Kan., for defendant Michael Lutkie.

## MEMORANDUM OF OPINION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

THEIS, District Judge.

This case arises out of a complaint of the plaintiff, The Ohio Casualty Insurance Company, under the Federal Declaratory Judgment Act, 28 U.S.C.A. § 2201 et seq., against the defendants Michael Lutkie, H. Marjorie Hart, Phillip L. Hart and John R. Hart, seeking a judgment of the court holding that the provisions of a certain automobile liability insurance policy issued by it do not cover the operation of a 1961 Plymouth automobile owned by Charlie Lutkie and operated by Michael Lutkie at the time of an automobile accident.

The policy of insurance, No. 965–49–84, which is the subject matter of this lawsuit, was issued on or about the seventh day of August, 1966, to one Julia B. Lutkie, the mother of Michael Lutkie. The insurance was issued in the amount of $5,000.00 for property damage, $10,000.00 liability for injuries to each person (limited to $20,000.00 for each accident) as a result of the operation of a vehicle or vehicles *specifically described in the policy.*

Michael Lutkie was involved in an automobile accident November 14, 1966, which accident caused the death of Robert A. Hart. The car Lutkie was driving at the time of the accident was a 1961 Plymouth. At the time of the acci-

dent Michael Lutkie, a minor, was a resident of the household of his parents, Charlie and Julia B. Lutkie, and had their permission to drive the 1961 Plymouth at all times herein material.

At the time of the accident Julia B. Lutkie was the title owner of a 1960 Plymouth, and Charlie Lutkie was the title owner of a 1961 Plymouth (the car involved in the accident). Charlie Lutkie also owned a 1950 Plymouth, the title of which was "open" or "blank."

Since about December, 1951, until the time of trial, one F. R. Hawk was the insurance agent of Charlie Lutkie and Julia B. Lutkie. During this time Hawk wrote both personal insurance and automobile insurance for the Lutkies. The particular policy in question, No. 965–49–84, was written by Hawk while he was acting within the scope of his employment with the C. Ray Tyler Insurance Agency, Wichita, Kansas, and issued August 7, 1966, with an expiration date of August 7, 1967. That policy, as originally written, provided stated coverage on a 1960 Plymouth and a 1960 Dodge.

The policy under consideration is not a family automobile policy which provides extensive, broad coverage to families residing together. It is a limited automobile policy of the type which provides optional coverage as set forth. This particular policy was written for Julia B. Lutkie and, consequently, Charlie Lutkie, who at all times material was authorized to transact all insurance business on behalf of his wife.

The Insuring Agreement V(d) (1) specifically provides that Policy No. 965–49–84 does not cover a resident member of the same household as the named insured and spouse while driving any automobile owned by the named insured and spouse, and not specifically covered by the policy.

On or about October 20, 1966, F. R. Hawk received a telephone call from Charlie Lutkie (Plaintiff's Exhibit 2) requesting that Policy No. 965–49–84 be changed to reflect the sale and deletion from the policy of the 1960 Dodge which had been covered, and the addition of a 1961 Plymouth to policy coverage, because of its recent purchase. An Automobile Policy Change Endorsement (Plaintiff's Exhibit 3) was subsequently sent by Hawk for his agency to the Lutkies on October 24, 1966, to be attached to Policy No. 965–49–84, which endorsement added the 1961 Plymouth per request, but erroneously eliminated the 1960 Plymouth from policy coverage instead of the 1960 Dodge. This error of the insurance agency was not noted until November 21, 1966, seven days after the accident, when Charlie Lutkie brought it to the attention of his insurance agent. A "correcting" endorsement was *then* created which reflected the elimination of the 1960 Dodge from coverage as of October 20, 1966, instead of the 1960 Plymouth.

A few days after October 20, 1966, Michael Lutkie approached his father, Charlie Lutkie, with the proposition that Charlie Lutkie purchase a particular 1950 Plymouth, which had been modified and contained a larger motor. While negotiations were being carried on regarding the purchase of the 1950 Plymouth, Charlie Lutkie called F. R. Hawk to inquire about the insurability of the 1950 Plymouth. This was a preliminary telephone call and no request for a change of the policy was made. This call occurred approximately two days before Charlie Lutkie purchased the 1950 Plymouth from one Bruce Colver for $550.00. The 1950 Plymouth was taken to the Lutkie home where it was parked in the yard; it had never been driven between the date of purchase and the date of trial. The car would not run and no license tags were purchased for it.

There is substantial dispute as to what subsequently happened regarding the 1950 Plymouth and the extent of Lutkie's insurance coverage. F. R. Hawk, who testified that Lutkie was very careful with his insurance, stated that Lutkie called him again and requested that the policy be changed to re-

flect the purchase of the 1950 Plymouth and the sale of the 1961 Plymouth. This testimony is claimed by plaintiff to be partially corroborated by a deposit slip of the vendor of the 1950 Plymouth (Plaintiff's Exhibit 9) dated October 28, 1966, and the purported endorsement dated October 28, 1966 (Plaintiff's Exhibit 5). Charlie Lutkie testified that he did not make a second telephone call to Hawk, nor did he ever request a change in the policy eliminating coverage of the 1961 Plymouth. The possession of the 1961 Plymouth was never surrendered, it was not sold, and it was driven constantly up until the day of the accident. Lutkie also testified that they never received the purported endorsement reflecting the elimination of the 1961 Plymouth and the addition of the 1950 Plymouth. Moreover, Julia B. Lutkie testified that she normally picked up the mail out of the box and she never saw or received the purported endorsement.

The evidence further showed that Charlie Lutkie knew what type of policy No. 964–49–84 was, and Hawk testified that Lutkie had made approximately eight transfers of cars under this particular type of policy. Hawk also testified that Lutkie was careful in his dealings with his personal car insurance except for the last transaction, where the insurance company now disputes coverage.

■ To counterphrase the title of one of the plays of Shakespeare, the factual situation before the Court might be deemed a "tragedy of errors"—two errors in description of what automobiles were covered, the error of the insured in believing he was insured, and last, the fatal driving error of the insured's son, causing the death of Robert A. Hart. As stated initially, the plaintiff brings the action asking for a declaratory judgment of the Court that the policy in question does not cover the factual situation here involved. As in any civil lawsuit, the burden of proof is upon the plaintiff to prove its case to the finder of fact by a preponderance of the evidence. All lawyers understand the phrase "preponderance of the evidence" and understand it to be something more than a stand-off, and in essence, the weight and credibility of the evidence which is most convincing in the light of all the facts and circumstances. This Court approaches this case with this concept in mind.

As counsel for the parties have noted, this case does not involve complicated principles of law but turns mainly upon a disputed fact between the plaintiff and the defendant as to whose error or omission may have caused the policy before the Court to describe the covered vehicle as a '50 Plymouth, instead of a '61 Plymouth. The plaintiff's very persuasive "Argument and Brief" points out a number of discrepancies, or apparent contradictions, in the testimony of the defendants' witnesses which plaintiff says impeaches such testimony and destroys its credibility.

Each of these so-called "credibility gaps" must be reached circumstantially and, it seems to the Court, most often conjecturally. Adding these all together, the plaintiff makes a very convincing argument to arrive at the conclusion that the witness Charlie Lutkie was not telling the truth, and that the plaintiff's agent and witness, Mr. Hawk, had no reason to distort the truth. Plaintiff's testimony hinges on and emphasizes the customary office practices of a large insurance agency, with supposedly competent clerical help, handling hundreds of insurance transactions within a week's time. In fact, plaintiff's principal witness, Hawk, admitted that the Tyler Agency, by whom he was employed, handled as many as twenty changeovers in policy endorsements per week. The witness Hawk, who appeared and claimed to be meticulous in detail in the discharge of his professional duties as an insurance agent, testified that Charlie Lutkie, who supervised the insurance contracts of the Lutkie family, did a good job of keeping coverage on the automobiles for his family and personal use, stating that the only one he knew him to be careless on was the last transaction—that is, the

one which the plaintiff now claims its policy did not cover.

The witness Hawk testified that a good deal of the agency's business was done by way of telephone, and it was customary for him to take notes of the telephone conversations and later reduce the notes to policy actions. He also testified that they made endorsements effective orally over the phone and that when endorsements were reduced to writing and sent to the customer they were sent without a covering letter or any form of special mailing designed to prove that the addressee actually received the communication. He admitted in his testimony that mistakes are sometimes made in his office and, in fact, it was very clear that at least one mistake of some magnitude had previously been made in regard to the Lutkie insurance file as to the same policy. This occurred on or about October 20, 1966, when the Lutkie family disposed of a '60 Dodge, bought the '61 Plymouth, and Charlie Lutkie advised Hawk by telephone of this change in the ownership of family automobiles. This mistake was discovered by Mrs. Lutkie in examining the family policies subsequent to the fatal accident which has motivated this lawsuit. It was discovered that the '60 Dodge had never been removed from coverage but, instead, there had been removed the '60 Plymouth, which was the car in the Lutkie family which was driven by the wife. The plaintiff insurance company admitted this error, made a corrective endorsement, and states in relation to this dispute that the former mistake has no relevancy whatsoever.

Actually, the main cleavage between the testimony of plaintiff's witness Hawk, and defendant's witness Charlie Lutkie, is that Hawk says that Lutkie made two calls about changing the coverage by deleting the '61 Plymouth and covering the '50 Plymouth, the substance of the first call being, according to Hawk's version, that Lutkie was thinking of buying a '50 Plymouth, disposing of the '61 Plymouth, and desired to know whether the '50 Plymouth was in-surable. This was followed up, according to the witness Hawk, by a second call on October 28th, the date on which the Plymouth was purchased, in which Lutkie told Hawk that the purchase transaction had been completed and that the endorsement change should be made. The testimony of the defendants' witness, Charlie Lutkie, is positive to the effect that only one conversation ever took place between him and the plaintiff's agent Hawk, several days prior to the purchase of the '50 Plymouth, in which he did inquire of Hawk about the insurability of the '50 Plymouth, stating that he was dickering to buy such a car and giving Hawk the motor number of the Plymouth. But, says Lutkie, he made no further calls to Hawk. Lutkie further testified that the '50 Plymouth, after its purchase, was inoperable, that it did not run, that it was parked in his yard, and that no license tags were ever purchased for it. He further testified that there was never any sale of the '61 Plymouth, any change of possession from the custody of himself or members of his family, and that he thought that he had insurance coverage on the '61 Plymouth at the time of the accident. His testimony further reflected his consternation, surprise, and anger upon learning from the agent Hawk that he probably had no insurance coverage under his policy for liability growing out of his son's accident. These reactions, it seems to the Court, would be quite normal.

This, then, illustrates the choice before the Court.

There are some illogics, likewise, in the plaintiff's position which throw doubt on the credibility of its factual version. Hawk testified that he took notes on the original conversation with Charlie Lutkie, but lost them. He operated a large office, handling numerous transactions, yet very clearly remembered this situation in detail as to two phone calls, car descriptions, and the Lutkie family data. He did not specifically remember how or when he signed the endorsement, but insisted that office procedures verified how and when

it was done. No one in the Lutkie family drove the '50 Plymouth after it was purchased—it was parked in the yard. The Lutkie family kept on using and driving the '61 Plymouth. The witness Hawk admitted that Lutkie was careful about his insurance policies. It would be illogical to conclude that a man described by his insurance agent as "careful" with his insurance affairs, would cancel the insurance on a car he and his son were operating every day, and insure a car not being driven at all.

The insurance agency had admittedly made a serious error in misdescribing the cars covered by Lutkie's insurance just a little over a week previous. In fact, considering that now-admitted error, and this one giving rise to this lawsuit, it is apparent that the Lutkies had a policy at the time of the accident covering no vehicle operated by them (the '60 Dodge and the '50 Plymouth), while both operable cars were not listed in the policy (the '60 Plymouth and the '61 Plymouth). It is difficult to envisage a more ludicrous situation.

There is another small area of credibility gap in the evidence between the plaintiff's testimony about mailing the last endorsement changing coverage from the '60 Plymouth to the '50 Plymouth, and the Lutkie's testimony that they never received this endorsement in the mail. As the Court views this case, there being such a conflict in the evidence, it would have no probative value even if it were admitted that the Lutkies had received a copy of the last endorsement—unless the Lutkie's actually were aware of the misdescription. Plaintiff indicates that their acknowledgment of receiving the mail containing the endorsement would have amounted to an estoppel by the Lutkies to claim a mistaken description (see bottom of page 8 of plaintiff's brief). In view of this attitude by the plaintiff one does not have to speculate that the insurance company would have also denied liability on this ground had the accident occurred by the '60 Plymouth, upon which the company admits it made a mistake in the October 20th endorsement—but concerning which the Lutkies admitted receiving it from the plaintiff company.

Viewing the evidence as a whole, the Court finds that the plaintiff has very definitely failed to meet its burden of proving its case by a preponderance of the evidence, and that the most credible evidence lies upon the defendant's version, under all the facts and circumstances.

There is one other aspect of this case that deserves comment. As is apparent from the parties in this lawsuit, there is much more at stake than the fact that there is a dispute between the insurer and the insured over the terms of the insurance contract. Third parties are involved who may suffer grievous damage and financial hardship if this policy is held ineffective here. The law is well-recognized in Kansas, as well as all of the other state jurisdictions of this country, that insurance policies are to be liberally construed, if possible, to effecutate coverage and protection to those for whose benefit the policy is issued. The law is equally well-established that where there is an ambiguity or vagueness in the wording of the policy as to the extent of coverage, all such questions are resolved against the insurance company and in favor of the insured.

Reference was made by this Court in Aetna Casualty and Surety Company v. Miller, 276 F.Supp. 341, beginning at page 347, to the fact that in Kansas, as well as the nation as a whole, insurance is such an essential part of the commercial activities of our people as presently conducted, that it long ago became a business impressed with the public interest, and hence subject to state regulation. Likewise, in that case, the Court pointed out that as a part of state police power, and to ameliorate the harsh effects of uncompensated automobile accidents, Kansas, like most other states, adopted the Uniform Financial Responsibility Act, declaring it to be the law of the state that all drivers of motor vehicles should be financially responsible.

While the thrust of that opinion was critical of the practice of insurance companies quibbling over ambiguous words and intent in their written insurance contracts in order to avoid coverage, it seems to this Court that the same requirement of high standard of conduct is equally applicable to the office procedures and practices of insurance companies and insurance agencies who represent these companies, and who issue policies designed to protect not only the insured but also the public against the negligent acts of an insured in the operation of his automobile upon the public streets and highways.

This case arises from a dispute of fact as to whether the insured gave the proper data to the insurance company's agent, and whether or not the subsequent policy endorsement executed by the insurance company covered the direction of the policy holder. No difference in premium rate or greater insurable risk is involved here. Great reliance was placed upon the fact of the normal business practice of the insurance company in the office procedure followed in preparing and mailing out such endorsements. Yet the undisputed testimony before the Court indicates that the bulk of the business is done by telephone, involving the hazard of hearing inaccuracy, as well as the always existent transcription and typographical errors which are bound to occur in even the best organized business office. It is further the testimony before the Court that the insurance customer—the prospective insured—is not required to sign any written memoranda confirming the accuracy of data in a contemplated insurance contract or changes therein, nor was there any cover letter written by the insurance agency transmitting the contract to the insured, nor any special mailing device used by the insurance agency to insure that the actual transmission by mail was received and noticed by its customer. In a business affected with the public interest which involves the insuring of losses of millions of dollars, as well as the public policy of the state that all motorists have effective liability insurance, this Court is of the opinion that there is a heavy burden upon the insurance carrier to be accurate and mistake-proof in its internal office procedures in inscribing the factual data of the contract. Injustice can flourish upon either inadvertence or ineptitude, and certainly no person contributing to such acts should profit from them.

On the basis of the evidence before it, the Court finds against the plaintiff's contention, finds that Policy No. 965–49–84 did cover the Lutkies '61 Plymouth, and directs that judgment be entered for the defendants.

This Memorandum of Opinion is intended to include Findings of Fact and Conclusions of Law, in accordance with Rule 52 of the Federal Rules of Civil Procedure.